ANDREW H. K. VAIL, Defendant in Error, *vs.* JOHN V. RYNEARSON *et al.* Plaintiffs in Error.

*Opinion filed April 19, 1911.*

1. EVIDENCE—*when complainant may testify though defendants are claiming as heirs.* The complainant in a bill for specific performance of a verbal contract relating to land is not competent to testify generally in the case where the defendants are claiming as heirs of the deceased promisor; but he is competent, under the exception in the statute, to testify to the same conversations and transactions given in evidence by the defendants and may deny that he had any such conversation as the defendants testify to.

2. SPECIFIC PERFORMANCE—*oral contract relating to land must be clearly proved.* An oral contract that one party shall have the other's land at the latter's death must be clearly proved and no doubt must be left as to its terms; but a court of review is not warranted in rejecting the testimony of witnesses who testified that they were present at times when the contract was stated between the parties, merely because such witnesses gave extravagant opinions as to the value of the promisee's services to the promisor.

3. CONTRACTS—*declarations of one party in absence of the other are not binding on the latter.* If there is an oral contract between parties whereby one party is to have the other's land at the latter's death, declarations of the latter in the former's absence, inconsistent with the contract, are not binding upon the former.

WRIT OF ERROR to the Circuit Court of Logan county; the Hon. T. M. HARRIS, Judge, presiding.

EDMUND P. NISCHWITZ, and BLINN & COVEY, for plaintiffs in error.

KING & MILLER, for defendant in error.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Margaret Harris died intestate on January 10, 1909, leaving a brother and nephews and nieces, her only heirs-at-law. She was the owner of a farm of eighty acres in Logan county and personal property on the farm and money deposited in the bank. The defendant in error, Andrew H. K. Vail, filed his bill in the circuit court of that county against the plaintiffs in error, the heirs-at-law and the administrator of the estate, praying for the specific performance of an alleged verbal contract by which he was to have said property at the death of Margaret Harris. The bill was answered with a denial that such a contract was made, and the issue was referred to the master in chancery. The master reported that the contract was made, as alleged, between the complainant and Margaret Harris and was performed by the complainant, and he recommended a decree in accordance with the prayer of the bill. The cause was heard by the chancellor on exceptions to the report, which were overruled and a decree was entered as recommended by the master. From that decree this appeal is prosecuted.

So far as the facts are not in dispute they are as follows: The land belonged to Thomas Harris up to the year 1876, when he died, leaving Margaret Harris, his widow, and Cornelia Harris, his daughter and only heir-at-law. The land was mortgaged for $3000 and the widow had not joined in the mortgage. His estate paid first-class claims in full and about fifteen cents on the dollar of seventh-class claims. The mortgage was foreclosed. The north forty was sold under the decree and the south forty was set off to the widow for her dower and homestead. In February,

1880, the complainant, a nephew of Thomas Harris, commenced work by the month for the widow, Margaret Harris, and remained on the farm in that relation at least until 1882. The daughter, Cornelia Harris, died in 1882, and by her death Margaret Harris became the owner of the south forty in fee simple. After the death of Cornelia Harris the complainant remained on the farm and took entire charge of it and he and Mrs. Harris constituted the family. On July 7, 1885, Mrs. Harris re-purchased the north forty from the purchaser at the mortgage sale and secured $2000 of the purchase price by a mortgage, which was finally paid in 1891. Complainant was about twenty-two years of age when the daughter died, and from that time up to the death of Mrs. Harris,—a period of about twenty-seven years,—he farmed the land, transacted all the business connected with it and assisted with the housework. When the daughter died Mrs. Harris was fifty or fifty-five years old, and she and the complainant lived alone on the farm until about 1905. She was not a strong woman and required help with the housework. During the last ten years of her life she gradually failed, mentally and physically, so that for the last few years she was a helpless invalid and unfit to transact any business. The complainant took care of her until about 1905, when the services of a nurse became a necessity and one was employed. On September 5, 1906, the complainant married the nurse, and the three lived together until the death of Mrs. Harris, the wife taking care of her. During the time that the complainant had charge of the farm he sold the produce, received checks payable to himself, deposited them to his own account in the bank and drew checks on the bank account for the farm and household expenses. For the last fifteen years, at least, the store account was carried in the name of the complainant, and he did practically all of the buying, including dry goods and clothing for Mrs. Harris and himself. He managed and farmed the place, marketed the

crops, handled the proceeds, and did all of the business the same as if it were his own. Mrs. Harris was very much attached to him and always praised him and his management of the farm and care of her.

There was no controversy over the fact that if the contract was made it was performed by the complainant, and the disputed question of fact was whether any contract was made. There was no testimony of any witness who was present when the parties entered into a contract, and the evidence tending to prove a contract was the following: A witness who was a mail-carrier at the time of the hearing and had formerly been in business running a store, testified that he heard a conversation at the dinner table of Mrs. Harris about a month after the daughter died, when the complainant was present; that Mrs. Harris then said she had agreed to give the complainant all that was left if he stayed and took care of her and that he had agreed to stay, and the complainant said he was willing to do that. A brother of the complainant testified that there was a family dinner at the farm in 1887; that he and complainant were the only ones living who were present at the dinner; that Mrs. Harris then said that she was going to make a will to leave complainant all the property she had after she was dead; that she had made a contract with him that if he would live with her as long as she lived she would give him all the property after she was dead and fix it so he could get it; that she asked complainant if that was not so, and he replied that it was; that that was the agreement and he would stay and do all he could for her. A brother of the first mentioned witness testified that he heard a conversation in 1898 at the dinner table when he was working there and when they had shocked and stacked for threshing, and that Mrs. Harris said she had made an agreement with complainant that if he would stay by her and take care of her as long as she lived he should have all that she had of this world's goods, and that complainant

said that was what he had done,—that he had made the same kind of an agreement to stay by her. This testimony as to conversations between the parties when the contract was stated was the only direct evidence of a contract and its terms. In addition there was testimony of statements by Mrs. Harris at different times, not in the presence of the complainant, that she was left alone and had nobody to take care of her; that she did not have anything unless complainant helped her; that she had nobody to look after her but complainant; that he was going to stay there and take care of her as long as she lived; that she would never have a home except for the complainant, who had finished paying off the indebtedness; that she had an awful good boy, and they had an agreement that if he would stay with her and take care of her as long as she lived, everything she had,—land and everything,—was his, and that she meant for him to have the place there after she was done with it.

On the part of defendants there was evidence that at the death of Mrs. Harris there was on deposit to the credit of complainant in the bank $1640.30 and there were time certificates of deposit in the name of Mrs. Harris to the amount of $2250. The fact of the deposit to the credit of the complainant is relied upon as tending to show that he was receiving wages, as he had no other source of income; but all the moneys were proceeds of crops and property belonging to the farm, and the account was kept in his name for convenience in doing the business and he checked on it for expenses. The certificates of deposit appear to have been for surplus moneys deposited from time to time, drawing interest and renewed at maturity, and they were payable to Mrs. Harris. A witness said he had a conversation with the complainant, which the witness thought was twenty-six or twenty-seven years before, in which the complainant said he was receiving $20 per month. One of the heirs testified that complainant told him he was working there by the month, and he and another witness testified

that the complainant, about six years before the hearing, said there was not a scratch of a pen and he supposed the heirs would get their share, and "you folks will get the same as any of the heirs." It is not at all certain that the conversation located by the witness twenty-six or twenty-seven years ago was not before the time of the contract, but the complainant denied that he had any such conversations with the witnesses as they testified to. It is contended that the complainant was not competent to testify in contradiction of the other witnesses as to what he said, because they were defending as heirs of Mrs. Harris. He was not competent to testify generally in the case, for the reason that the defendants claimed title because of their relation to Margaret Harris as her heirs-at-law, (*Drury* v. *Henderson,* 143 Ill. 315; *Leavitt* v. *Leavitt,* 179 id. 87;) but he was competent, under the exception in the statute, to testify to the same conversations and transactions given in evidence on the part of the defendants. (*Plain* v. *Roth,* 107 Ill. 588; *Griffin* v. *Griffin,* 125 id. 430; *Blanchard* v. *Blanchard,* 191 id. 450.) One of the defendants, a brother of Mrs. Harris, testified that she told him, when visiting in New Jersey, more than twenty years before her death, that she was hiring the complainant and gave him $200 a year and most of his every-day clothes, and a niece, who was a defendant, testified to the same statement, and that Mrs. Harris said she did not want any of the Vails or Harrises to have her money, and wanted her sister and brother, if they were living, to have it, and if not living, for their children to have it. Another witness testified that Mrs. Harris said, in the absence of the complainant, that she hired him, and always said that when she died she wanted her brother's children to have her property. This witness was mistaken at least as to the fact that the complainant was living on the farm when Thomas Harris died, in 1876, and it is evident that the statement made in New Jersey was not true, since it is clear that the complainant was not

appropriating anything for himself, but applied the proceeds of the farm to the support of himself and Mrs. Harris and to pay off the mortgage and afterward deposited the proceeds in the bank.

Such a contract as was alleged must be clearly proved and no doubt must be left as to its terms. If the proof of the contract rested upon declarations of Mrs. Harris in the absence of the complainant they would be insufficient, and it is equally true that if there was a contract any declarations made by her in his absence would not bind him. It is apparent that the conclusion as to the existence of a contract rests upon the testimony of the three witnesses who say that they heard it stated between the parties, and if they are to be believed the contract was proved. There is no inherent improbability in their testimony which would justify us in rejecting it. Some of the witnesses for the complainant gave foolish and extravagant estimates of the value of the complainant's services, but they were matters of opinion and do not cast discredit upon the testimony of the witnesses as to facts. The record furnishes no reason to question the credibility or doubt the testimony of the witnesses who say they heard the contract stated by Mrs. Harris and her statement assented to by complainant. If there was a contract it was fully performed by the complainant. He received nothing but his living expenses, and he could not be recompensed for his services, covering a period of twenty-seven years, except by specific performance of the agreement. He was practically in entire possession of the farm and property for a long time before and at the death of Mrs. Harris and remained in possession afterward.

We do not find any sufficient reason to authorize a reversal of the decree, and accordingly it is affirmed.

*Decree affirmed.*